# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK SOLANO MENDOZA,<br><br>      Petitioner,<br><br>   vs.<br><br>MIKE YARBROUGH,<br><br>      Respondent. | CASE NO. CV-F-03-5004 DLB HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT<br><br>[Doc. 1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

## PROCEDURAL HISTORY

On November 4, 1999, Petitioner was convicted in the Kern County Superior Court of the following: possession of phencyclidine (PCP) in violation of California Health and Safety Code section 11377(a), driving under the influence of alcohol in violation of California Health and Safety Code section 23152(a), and being under the influence of a controlled substance in violation of California Health and Safety Code section 11550(a). In addition, the court found true the allegation that Petitioner had suffered two prior strike convictions and that Petitioner had served nine prior prison terms.

///

1   Petitioner was sentenced to state prison for an indeterminate term of 25 years to life for
2   possession of phencyclidine (PCP), plus an additional six-year consecutive term for the prior prison
3   term enhancement. The sentence was subsequently amended to strike Petitioner's prior prison term
4   enhancement. (Respondent's Exhibit B, attached to Answer.)

5   Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate
6   District. On December 12, 2001, the Court of Appeal affirmed the judgment. (Respondent's Exhibit
7   D.)

8   On January 18, 2002, Petitioner filed a petition for review with the California Supreme
9   Court. (Respondent's Exhibit E.) The petition was denied on February 20, 2002. (Respondent's
10  Exhibit F.)

11  On January 29, 2003, Petitioner filed a petition for writ of habeas corpus with the Kern
12  County Superior Court. (Respondent's Exhibit G.) On February 27, 2003, the petition was denied.
13  (Respondent's Exhibit H.)

14  On March 26, 2003, Petitioner filed a petition for writ of habeas corpus with the California
15  Court of Appeal, Fifth Appellate District. (Respondent's Exhibit I.) On November 7, 2003, the
16  Court of Appeal denied the petition. (Respondent's Exhibit J.)

17  On January 3, 2003, Petitioner filed the instant federal petition for writ of habeas corpus. By
18  order of May 1, 2003, the Court directed Respondent to file a response to the petition. On June 16,
19  2003, Respondent filed a motion to dismiss arguing that the petition was a mixed petition containing
20  both exhausted and unexhausted claims.[1] On September 23, 2003, Petitioner filed an opposition and
21  request to withdraw the unexhausted claims. On October 29, 2003, the Court issued an order
22  granting Petitioner's request to withdraw the unexhausted claims. Thus, this action is proceeding on
23  Claims Two and Three of the petition.

24  On March 29, 2004, Respondent filed an answer to the petition.
25  On April 26, 2004, Petitioner filed a traverse.
26  ///

---

[1] On September 29, 2003, Respondent filed an amended motion as the previously filed motion did not include the referenced exhibits.

2

## STATEMENT OF FACTS

On July 31, 1999, Officer Dennis Moore of the Bakersfield Police Department received a radio broadcast regarding a potential drunk driver. Officer Moore responded to the location and observed Petitioner's 1991 black Chevrolet pick-up truck parked on the south curb line of Lake Street and Baker Street. (RT 389-392, 394, 451.) Officer Moore approached the vehicle and illuminated the interior of Petitioner's vehicle with a spotlight. (RT 392.) At which time, Petitioner pulled away from the curb and drove over the crown of the road for 100 to 150 feet. (RT 392-393.) Officer Moore then activated his emergency lights. (RT 393.) Petitioner then stopped the vehicle after driving approximately 100 to 150 additional feet. (RT 392-394.)

Officer Moore ordered Petitioner to place his hands on his head to which he refused. (RT 394-395.) Petitioner's person and breath smelled of alcohol, his eyes were red and blood shot, and his speech was thick and slurred. (RT 397, 408.) Officer Schimon arrived to assist Officer Moore. Officer Schimon performed a horizontal gaze nystagmus test on Petitioner from which it was determined that Petitioner was under the influence of PCP. (RT 401.) It was observed that Petitioner was "moonwalking" or "high stepping" which is consistent with a person being under the influence of PCP. (RT 402-403, 453-454.) It was the opinion of both Officers Moore and Schimon that Petitioner was in fact under the influence of PCP. (RT 402-403, 454.) It was determined that Petitioner could not safely operate a vehicle. (RT 404.)

Petitioner was therefore arrested. (RT 404.) An inventory search of Petitioner's vehicle was conducted in which a hand rolled cigarette was recovered from the visor inside the vehicle. (RT 405, 407, 455-457.) Inside the cigarette was a leafy green substance and a small amount of crystal which appeared to be PCP. (RT 407, 457.) It was subsequently determined by Criminalist Matthew Frierson that the cigarette did contain a usuable amount of PCP. (RT 488-489.)

At 11:35 p.m. on the evening of Petitioner's arrest, Norma Glory, a nurse for the Kern County Medical Center, drew two vials of Petitioner's blood. (RT 348-350, 380-381.) Toxicologist Allison High confirmed the presence of PCP in Petitioner's blood. (RT 504.)

///

///

DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

1  approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.
2  1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court
3  concludes in its independent judgment that the relevant state-court decision applied clearly
4  established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,
5  that application must be objectively unreasonable."  Id. (citations omitted).

6       While habeas corpus relief is an important instrument to assure that individuals are
7  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);
8  Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal
9  conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.
10 Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual
11 determinations must be presumed correct, and the federal court must accept all factual findings made
12 by the state court unless the petitioner can rebut "the presumption of correctness by clear and
13 convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769
14 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,
15 1388 (9th Cir. 1997).

16 C.    Juror Misconduct

17      Petitioner contends that one of the jurors went home consulted with his wife, researched on
18 the Internet, and used a dictionary to find the meaning of the terms "constructive possession" and
19 "circumstantial evidence."  Petitioner contends the trial court abused its discretion when it failed to
20 remove the juror from the panel and denied the motion for retrial because the panel was poisoned by
21 the juror's actions.

22      "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial
23 . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145
24 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has
25 prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494
26 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835 (1974).  Although it is generally preferred that a
27 trial court hold an evidentiary hearing when allegations of juror misconduct arise, it is not always
28 required, particularly when the court knows the exact scope and nature of the misconduct.  See

United States v. Halbert, 712 F.2d 388, 389 (9th Cir.1983); United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1977); see also United States v. McVeigh, 153 F.3d 1166, 1187 (10th Cir.1998), *cert. denied*, 119 S.Ct. 1148 (1999).  The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), *quoting* Smith v. Phillips, 455 U.S. 209, 217 (1982).  When the alleged misconduct is intra-jury, it has been widely held that the trial court is entitled to greater deference in its review, because the misconduct is less serious than extra-jury influences.  See Tanner v. United States, 483 U.S. 107, 117- 21 (1987); Smith v. Phillips, 455 U.S. 209 (1982); Remmer v. United States, 347 U.S. 227, 228-30 (1954); Mattox v. United States, 146 U.S. 140, 149 (1892); United States v. Bertoli, 40 F.3d 1384, 1393 (3d Cir.1994) ("[I]ntra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences, and therefore district courts are entitled to even greater deference in their responses to them than in responses to outside influences."). United States v. Ford, 840 F.2d 460, 465-66 (7th Cir.1988); Government of Virgin Islands v. Gereau, 523 F.2d 140 (3d Cir.1975), *cert. denied*, 424 U.S. 917 (1976); Fed.R.Evid. 606(b) (juror may only testify post-verdict on the question whether extraneous influence was brought to bear on jurors).  Petitioner has the burden of showing that internal juror misconduct prejudiced him. See United States v. Dutkel, 192 F.3d 893, 895 (9th Cir.1999).

A petitioner is entitled to habeas relief, however, only if it can be established that the exposure to extrinsic evidence had a "substantial and injurious effect or influence in determining the jury's verdict." Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

The following factors are relevant to the prejudice determination: "(1) whether the material was actually received; and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable probability of whether the extrinsic material affected the verdict." Sassounian v. Roe, 230 F.3d at 1109.

///

During deliberations, the jury requested that the trial court clarify the terms "constructive possession" and "circumstantial evidence." (CT 397; RT 602.) Since it was near the end of the day, the court dismissed the jurors and indicated that it would respond to their question the next morning. (RT 604-605.)   That evening, juror No. 5 decided to research the meaning of "circumstantial evidence" on the internet, and consulted a dictionary.

The following morning, juror No. 5 handed the bailiff a note asking if he could take one page of the internet research into the deliberation room. (RT 608-609.) The judge read the material into the record. (RT 609-611.) In response, to juror No. 5's question, the judge called all of the jurors into the courtroom and asked the foreperson if juror No. 5 had shared the information from the Internet with the others. (RT 615-618.) The foreperson indicated that he had not shared the information or indicated that he had searched the Internet. (RT 618.) The foreperson did indicate that juror No. 5 had informed the jury that he consulted a dictionary and the other jurors told him "please don't discuss it, we don't want to hear about it." (RT 618-619.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held the following:[2]

> Although the actions of juror No. 5 constitute misconduct, the presumption of prejudice has been rebutted in this case. We hold that the information obtained by juror No. 5 was neither inherently prejudicial nor substantially likely to prejudice either juror No. 5 or the other jurors. . . .
> In the instant case, the nature of the outside information and the extent of the juror's misconduct did not prejudice defendant; nor did the circumstances demonstrate any juror bias against [Petitioner]. Juror No. 5 disclosed the internet information to the court and did not use it to influence other jurors. He disclosed his use of the dictionary to the court and tried to mention the definition in deliberations, but the other jurors prevented him from discussing it. In this case, the information involved definitions of legal terms, matters upon which the court had earlier instructed and then clarified after this incident. The information did not constitute allegations about the [Petitioner's] character. The trial court accepted the assurances of juror No. 5 that he had not discussed the case with others and that he could ignore the outside information.

(Respondent's Exhibit D, at 9-10.)

---

[2] Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

Although the actions of juror No. 5 in conducting independent research constitute misconduct there was no resulting prejudice to Petitioner. The trial court promptly held an evidentiary hearing regarding the juror's conduct. At which time, the trial judge questioned not only juror No. 5, but also all the other jurors on the panel. The foremen unquestionably indicated that none of the information that juror No. 5 had researched was disclosed to the other jurors, resolving any ambiguity that the other jurors may have been exposed to extraneous information. (RT 618-620.) The trial judge properly assessed juror No. 5's credibility and determined that he was credible and forthcoming with the Court. (RT 638-639.) Thus, Petitioner has not, and cannot, demonstrate any resulting prejudice by the juror's actions.

Petitioner's contention that juror No. 5 improperly discussed the case with his wife, is without merit. During the evidentiary hearing, the trial court specifically questioned the juror as follows:

> THE COURT: After you got this, did you sit down and chat with [your wife] a little bit about it?
> THE JUROR: We, I printed it, and that's all.
> THE COURT: You didn't talk about - -
> And there's no right or wrong answer, only an honest one, sir.
> There is a little part of me that thinks maybe, if you went this far, you went ahead also and maybe had a little conversation with your wife about some of this, and so I'm just curious and so I'm asking.
> THE JUROR: She may have read that paragraph, or that paper.
> THE COURT: Okay.
> She's a teacher, right?
> THE JUROR: Right
> THE COURT: What grad level?
> THE JUROR: Kindergarten.
> THE COURT: And you guys have been married 42 years?
> THE JUROR: Correct.
> THE COURT: All of that causes me to believe that maybe you might have had some conversation with her about this subject matter, and again, if you did, I'm not gonna punish you. I'm not going to throw things at you.
> But, I do need to know the truth, and the attorneys need to know exactly what happened last night.
> THE JUROR: She doesn't know, you know, the circumstances of what was goin' on.
> I tried to keep that private.
> THE COURT: Okay.

(RT 623-625.)

After questioning juror No. 5 and listening to argument by counsel, the trial judge held the following:

> I did everything that I could to lead [juror No. 5] into telling us that he and his wife had sat down, and thoroughly discussed this particular matter.
> And I did it directly. I did it indirectly.
> And I was well satisfied that he was honest, and was candid, and my experience, by the way, which is not a part of this, is somewhat much of the same as his, when I need help getting into a particular area on the Internet, I do ask for it.
> Once I get it, I want that person who was helping to get out of the way, let me get what I need, get out of there, and then go from there.
> And on the first topic that you brought up, I had a completely different perception.
> My perception was that he was, in fact, wanting to make sure that he was going to decide this case properly, not based on anything else.
> So, motion to replace him, which is, in essence, a motion for a mistrial, because we do not have an alternate, is denied.

(RT 638-639.)

Juror No. 5 clearly indicated that he had not discussed the particular circumstances of Petitioner's case with his wife and merely asked for her assistance in helping get onto the Internet as there was a discrepancy amongst the jurors regarding certain definitions of legal terms. The record simply does not support Petitioner's conclusory contention that juror No. 5 discussed the merits of Petitioner's case with his wife. The fact that the juror's wife was aware that he was on the jury and that there was a discrepancy as to the definition of certain terms does not support a finding that Petitioner was in anyway prejudiced in his criminal trial, nor does this support a finding that the juror engaged in misconduct.

Because there was no resulting prejudice to Petitioner, it cannot be said that the juror's misconduct had a substantial and injurious influence on the jury's verdict. Brecht v. Abrahamson, 507 U.S. at 623. Petitioner has failed to carry his burden of proof. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, the petition for writ of habeas corpus must be denied.

D.  Cruel and Unusual Punishment

Petitioner contends that his sentence of 25 years to life for possession of a small amount of drugs was cruel and unusual punishment as no violence or harm was involved.

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment. The constitutionality of a 25-to-life sentence for nonviolent recidivists is controlled by several decisions rendered by the Supreme Court. Andrade v.

Attorney General of the State of California, 270 F.3d 743 (9th Cir. 2001). For purposes of the Antiterrorism and Effective Death Penalty Act (AEDPA), the cases of Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133 (1980); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001 (1983), and Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), are clearly established federal law governing the application of the Eighth Amendment to such sentences. Id. at 766.

Pursuant to this line of cases, the court must first compare the harshness of the penalty to the gravity of the offense to determine whether the sentence raises an "inference of gross disproportionality." Id. at 755-759. If such an inference is raised, the court then must proceed to analyze the sentences imposed on other criminals in the same jurisdiction, and the sentence imposed for commission of the same crime in other jurisdictions. Id. The second and third factors need not be considered if the court concludes under the first factor that a defendant's sentence does not raise an inference of gross disproportionality to the crime. Id. at 759. Only if the state court's proportionality analysis is "contrary to or involves an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," may the federal court grant habeas corpus relief. Id. at 766.

In Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133 (1980), the Court upheld a life sentence imposed under a Texas recidivist statute for a defendant convicted of obtaining $120.75 by false pretenses, an offense normally punishable by imprisonment for two to ten years. Rummel v. Estelle, 445 U.S. 263, 266, 100 S.Ct. 1133, 1135 (1980). However, because he had two prior felony convictions (for fraudulent use of a credit card and passing a forged check), and had served two prior prison terms, the prosecution chose to proceed under the state's recidivist statute, which carried a life sentence. Id. The Supreme Court held that Rummel's sentence of life imprisonment *with* the possibility of parole did not violate the Eighth Amendment. Id. at 365-266, 100 S.Ct. at 1135. (emphasis added). The Court noted that Rummel had suffered two separate convictions and terms of imprisonment for each prior, that he would be eligible for parole in twelve years, and that under the Texas recidivist statute, prosecutors retained the discretion not to invoke the statute for "petty" offenders. 445 U.S. at 278-81, 100 S.Ct. at 1141.

///

1  Three years later, the U.S. Supreme Court set forth the criteria for finding a sentence to be cruel and unusual punishment under the federal Constitution and affirmed a decision of the Eighth Circuit holding unconstitutional a sentence of life imprisonment without the possibility of parole for a seven-time nonviolent felony recidivist. Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001 (1983). Applying the proportionality criteria, the Court concluded that Solem's sentence was grossly disproportionate to his crime of uttering a "no account" check for $100.00, even in light of his prior six nonviolent felony convictions: three for third degree burglary, one for obtaining money under false pretenses, one for grand larceny, and one for driving while intoxicated. Id. at 279-81, 103 S.Ct. at 3004-5. The Court emphasized that Solem's life sentence was far more severe than the sentence it had considered in Rummel, because Rummel was likely to be eligible for parole in twelve years, while Solem was given no possibility of parole at all. Id.

In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), the defendant received a mandatory sentence of life in prison *without* the possibility of parole for possession of more than 650 grams of cocaine, his first felony offense. Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991) (emphasis added). The U.S. Supreme Court upheld the sentence, with five justices agreeing, for varying reasons, that the sentence did not violate the Eighth Amendment. Although the Court did not produce a majority opinion, seven justices favored some manner of proportionality review. Justice Kennedy, joined by Justices O'Connor and Souter, stated that a noncapital sentence could violate the Eighth Amendment if it was "grossly disproportionate" to the crime, but concluded that courts need not examine the second and third factors of intrajurisdictional and interjurisdictional reviews discussed in Solem, unless "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Id. at 1005. The Ninth Circuit, adopting Justice Kennedy's concurring opinion in Harmelin, now refers to the test articulated as "the rule of Harmelin." Andrade v. Attorney General of the State of California, 270 F.3d 743, 756 (9th Cir. 2001).

The majority of the justices in the Harmelin court agreed that outside capital punishment, deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of objective guidelines for terms of imprisonment. Harmelin, 501 U.S. 957, 964, 111 S.Ct. 2680 (1991). The

threshold for such an inference of disproportionality is high.  See, Id. at 1001, 111 S.Ct. at 2707 (Kennedy, J. concurring).  Generally, so long as the sentence imposed by the state court does not exceed statutory maximums, the sentence will not be considered cruel and unusual punishment under the Eighth Amendment.  United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

The Harmelin Court concluded that the defendant's sentence did not meet the threshold factor of "gross disproportionality."  Justice Kennedy stressed the serious nature of Harmelin's offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively minor, nonviolent crime at issue in Solem."  Harmelin v. Michigan, 501 U.S. 957, 1002, 111 S.Ct. 2680, 2705 (1991).  Justice Kennedy further noted that the "possession, use, and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" and that the quantity of cocaine possessed by Harmelin had a potential yield of between 32,500, and 65,000 doses.  Id.

In two recent Ninth Circuit Court of Appeal's decisions, the Court has recognized that an Eighth Amendment challenge under the Three Strikes law remains viable in certain "exceedingly rare" cases.[3]  Reyes v. Brown, 399 F.3d 964 (9th Cir. 2005); Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004).

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:

> [Petitioner's] prior rape conviction involves a crime that is deemed both a "violent felon" and a "serious felony" under the California Three Strikes law.  (Pen. Code, §§ 667.5, subd. (c)(3); 1192.7, subd. (c)(3).)  His crimes involving drug use and possession also arise in the context of his prior attempted robbery (his other prior strike) and numerous burglaries and other theft offenses; his drug use may reasonably be linked with his demonstrated past violence and extensive commission of property crimes. . . .
> Moreover, [Petitioner] has a long history of failing rehabilitative efforts, having, on numerous occasions, violated the terms of his probation and parole.  [Petitioner] is precisely the kind of repeat felon whom the Three Strikes law was designed to deter.  As he has continued to commit felonies, the state now has no choice but to incarcerate him for the protection of society.

(Respondent's Exhibit D, at 16.)

In the instant case, Petitioner was found guilty of felony possession of PCP and misdemeanor driving under the influence and being under the influence of PCP.  Petitioner's offenses are either on

---

[3] The Court notes for the reasons explained below, this is not one of those "exceedingly rare" cases.

12

the same level or more serious than the underlying offenses in the cases discussed above. Petitioner's crime of possession is more serious than Rummel's crime of obtaining $120.75 by false pretenses. Rummel, 445 U.S. at 266. His crime is also more serious than Solem's crime of uttering a "no account" check for $100.00. Solem, 463 U.S. 279-281. Petitioner's offense is similar to the defendant's nonviolent offense of possession of more than 650 grams of cocaine in Harmelin, although the amount Petitioner possessed was substantially less. Harmelin, 501 U.S. at 1005. Petitioner's crime is more serious than the defendant's crime of petty theft in Ewing, and the Supreme Court upheld the life sentence in Ewing. Ewing, 123 S.Ct. at 1186-1187. Petitioner's offense is also more serious than the defendant's crime of petty theft in Andrade. Andrade, 123 S.Ct. at 1166 (2003).

Furthermore, as the Supreme Court stated in Ewing, "[i]n weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism." Id. at 1189-1190. In the instant case, the jury found Petitioner had been convicted of two prior serious felonies, or "strikes" - rape and attempted robbery. To the extent Petitioner argues in his traverse that the prior offenses cannot constitute "strikes" under the Three Strikes law because they occurred prior to its enactment, Petitioner's claim is without merit. Petitioner was convicted of the triggering offense in November 1999, after Three Strikes was enacted, and therefore the use of the pre-1994 priors to enhance his sentence was not unlawful.[4]

Petitioner's criminal career is extensive, as stated by the trial judge at sentencing:

> [Petitioner] first went to the Department of Corrections in 1975.
> And I do note that he successfully completed parole.
> And for a couple of years, after being released from prison, he did fairly well.
> But, by May of 1980, he was back involved in the criminal justice system.
> That particular matter, it being a 476(a), treated as a misdemeanor under Penal Code Section 17, resulted in misdemeanor probation and 45 days in jail.
> That sentence was on June 17, 1980.
> In 1981, he had a pretty good year.
> He had on misdemeanor for 487.3, for which he received 60 days in jail.
> But then, quite frankly, starting in 1982, it looks as if he just consistently

---

[4] The Ninth Circuit has held that the use of a pre-1994 strike to enhance a sentence does not violate the ex post facto clause as long as the triggering offense was committed after March 1994, when Three Strikes was enacted. United States v. Sorenson, 914 F.2d 173, 174 (9th Cir.1990); United States v. Ahumada-Avalos, 875 F.2d 681, 683-84 (9th Cir.1984) (*per curiam*).

> committed a variety of offenses, and I'm sure that drugs were behind each and every one of them, as he has stated.
> In 1982 he was sent to the Department of Corrections, he gets out on September 15th of 1983. On November 22nd of 1983, he's got a 476(a), and he's put on probation. 1984 he gets the 11550, he does a hundred and twenty days.
> And then in 1985, he picks up three cases, and on each one of those, on May 6th, he is sent to the Department of Corrections.
> This is where it gets interesting.
> Sadly so, I might add.
> Because he is released on parole on April 15, 1987, and on June 22nd of 1987 he commits a second degree burglary.
> For that, he is sent to the Department of Corrections, and he gets out on February 9th, of 1989.
> He's got a parole violation.
> In November of 1989, he is returned to custody, and he is paroled out on March 4th of 1990.
> September 27th of 1990, he has the attempted robbery.
> He's sent to prison.
> He gets out on September 28th, 1991.
> On December 16, 1991, he commits the second degree burglary, the priors, or, at least one prior, excuse me, is alleged.
> He's sentenced to the department.
> On that case, as well as on the other case, the 470.
> On February 13, 1992, he's sentenced to four years.
> He gets out, and in December of 1994, he gets picked up on a commercial burglary that is treated as a misdemeanor, under Penal Code section 17.
> Probation is denied.
> He gets a year in jail.
> In '96, he's got the DUI.
> That's in March.
> In may of '96 he's got the spousal abuse. He gets a year in jail.
> '99, July of '99, he's got the driving without a license, that's no big deal, and then he's got the arrest for the 290 situation that I guess has yet to be resolved.

(RT of December 16, 1999, sentencing hearing, at 18-21.)

Petitioner's long and continuous criminal history demonstrates that he is unable to avoid reoffending for any length of time. Just as the Supreme Court found in <u>Ewing</u>, Petitioner's sentence of 25 years to life is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and is amply supported by Petitioner's long, serious criminal record. <u>Id</u>. As stated by the Court of Appeal, Petitioner is precisely the type of repeat offender the Three Strikes law was designed to deter. Accordingly, Petitioner's sentence, when compared with his underlying offense, does not raise an inference of gross disproportionality and therefore does not violate the Eighth Amendment of the Constitution. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

## ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1. The petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court is directed to enter judgment in favor of Respondent.

IT IS SO ORDERED.

**Dated:   April 29, 2005**              /s/ Dennis L. Beck
3b142a                                         UNITED STATES MAGISTRATE JUDGE